# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JODIE LYNN ALDRICH, | CASE NO. 3:13-cv-02321-RPC-GBC |
| Plaintiff, | (JUDGE CONABOY) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | REPORT AND RECOMMENDATION<br>TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 13, 14, 16, 17 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Jodie Lynn Aldrich for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). In order to receive DIB, Plaintiff has to establish disability prior to March 31, 2010, her date last insured. A state agency physician reviewed Plaintiff's records, and concluded that she could engage in a range of work as of March 31, 2010. The administrative law judge ("ALJ") relied on this opinion and concluded that Plaintiff was not disabled as of March 31, 2010. Plaintiff asserts that the Court should reweigh the medical evidence that was reviewed by the state agency physician and find that it supports an award of benefits.  However, the ALJ was entitled to rely on the state

agency physician's interpretation of these records. Plaintiff also asserts that the ALJ should have credited her complaints of pain prior to March 31, 2010 because the medical evidence corroborates those complaints. Again, however, a medical expert reviewed the medical evidence and concluded that, while Plaintiff experienced limitations as a result of pain, she was not precluded from working. Moreover, Plaintiff has not challenged the other reasons provided by the ALJ for discounting the credibility of subjective complaints, namely Plaintiff's lack of treatment from 2006 to 2008, with only conservative treatment thereafter, and Plaintiff's testimony that her condition worsened after having surgery in October of 2011. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.     Procedural Background

On February 3, 2011, Plaintiff filed an application for DIB. (Tr. 109-110). On April 20, 2011, the Bureau of Disability Determination denied this application (Tr. 89-93), and Plaintiff filed a request for a hearing on May 16, 2011.  (Tr. 94-95). On January 30, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert appeared and testified. (Tr. 53-86).  On February 14, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 10-26). On March 30, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 6-9), which the Appeals Council denied on

July 2, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On September 12, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On May 28, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 13, 14). On April 29, 2014, the case was referred to the undersigned Magistrate Judge. On July 14, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 16). On August 14, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 17). The matter is now ripe for review.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of*

*U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on June 16, 1974, and was classified by the regulations as a younger individual through the date last insured. (Tr. 21). 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and has past relevant work as a "CNC operator, sign maker, general laborer, freezer stacker, and day care worker." (Tr.

21). Plaintiff must establish disability prior to March 31, 2010, her date last insured, to be entitled to DIB, so the Court focuses on the evidence relevant to this date. (Tr. 15).[1]

In July of 2004, Plaintiff fell and injured her tailbone. (Tr. 229). X-rays of her coccyx were negative, but she began reporting an increase in lower back pain radiating into her thigh a few weeks later. (Tr. 232). She continued complaining of low back pain through September of 2004. (Tr. 233-35). In October of 2004, Plaintiff reported injuring her wrist at work. (Tr. 236). Plaintiff continued complaining of low back pain in February of 2005, and reported injuring her tailbone again after falling off a ladder in April of 2005. (Tr. 240, 242). Plaintiff was prescribed Vicodin, "no more than 8 a day." (Tr. 243).

In December of 2005, Plaintiff complained of shoulder and rotator cuff pain from repetitive movements at work. (Tr. 254). Plaintiff was prescribed physical therapy and placed on work restrictions for fourteen days. (Tr. 254).

On March 21, 2008, Dr. Vikas Passi, M.D., evaluated Plaintiff as a new patient. (Tr. 298). Plaintiff was "[f]eeling well" and she was "exercising twice a week." (Tr. 298). Plaintiff reported that she had "a multitude of problems," including a "fusion between the tail bone and the spine." (Tr. 298). Plaintiff was taking 1.0 m.g. of Lorazepam twice a day and "Hydrocodone/Apap 10-325 mg"

---

[1] Plaintiff has not challenged the ALJ's assessment of her mental impairments, so the Court will also limit its discussion to her physical impairments. (Pl. Brief).

every four to six hours as needed. (Tr. 299). Plaintiff reported that she had "been taking the pain medication every 4-6 hrs and has been doing so for about five years…the patient's bottle [had] 250 pills dispensed and this was to be a months supply." (Tr. 298). Plaintiff denied musculoskeletal, neurologic, and psychiatric symptoms. (Tr. 298). Plaintiff "appear[ed] healthy and well developed," she "walk[ed] with a normal gait," she had full range of motion, and her sensation and reflexes were intact. (Tr. 299). Plaintiff was assessed to have chronic pain syndrome, and her records were requested from her former doctor. (Tr. 299). Notes indicate "[u]nable to have new MRI done because she has no insurance." (Tr. 299).

At a follow-up with Dr. Passi on April 28, 2008, notes indicate:

> [Plaintiff] follows up for chronic lumbago. I spoke to her former physician, who confirmed the diagnosis and felt that the lumbago was the organic basis for continued pain medication based on imaging studies that he had done in the past and her history. She apparently had a history of low back injury and may have had some history of coccyx fracture as well. He was not able to confirm MRI findings for me, but formal records are still pending. He did tell me that the patient had been on  a chronic stable dose of the hydrocodone for nearly a year and a half without any evidence of abuse, etc.

(Tr. 302). Plaintiff had tenderness to palpation in her back, but her physical examination was otherwise normal. (Tr. 302). Plaintiff submitted to a urine drug screen and her medications were continued. (Tr. 302).

On October 20, 2008, Plaintiff followed-up with Dr. Passi. (Tr. 305). Dr. Passi noted that Plaintiff's back pain was "controlled." (Tr. 305). Dr. Passi also

noted that Plaintiff would "hopefully have insurance in the next few months as she has started a new job. We can then start referring her to pain management and get the appropriate imaging studies to better manage her condition." (Tr. 305). Plaintiff's physical examination was normal. (Tr. 305).

On January 27, 2009, Dr. Passi noted that Plaintiff "now has insurance," so they were "to begin the diagnostic work…to try to establish diagnosis as well as further treatment." (Tr. 314). Plaintiff was complaining of back pain and pain in her knees, so diagnostic imaging was done of the back and knees. (Tr. 314). X-rays of Plaintiff's lumbar spine and knees were "unremarkable." (Tr. 315, 317).   On March 2, 2009, Plaintiff had a "normal physical exam" with a normal gait and "intact strength and sensation" in her extremities. (Tr. 317). Plaintiff's medications were continued. (Tr. 317).

On May 26, 2009, Plaintiff followed-up with Dr. Passi. (Tr. 322). Plaintiff was reporting a lump on the back of her neck that had been present for about a year that was getting bigger and more painful. (Tr. 322). She reported that "some mornings it is very painful and radiates down back pain & shoulders" and that she sometimes has numbness and tingling in her fingers. (Tr. 322). On examination, her head and neck were grossly within normal limits, with no tenderness and full range of motion with discomfort. (Tr. 322). X-rays of Plaintiff's cervical spine from that day indicated "a negligible levoconvex curvature of the lower cervical

spine," "at least mild degenerative disc disease at C5-6 and to a lesser extent at C4-5," "uncovertebral degenerative spurring," and "at least moderate" foraminal stenosis. (Tr. 324). Plaintiff's Prilosec, Lorazapam, hydrocodone, and nabumetone were continued, and she was also prescribed a Medrol Dosepak and cyclobenzaprine. (Tr. 323). At a follow-up on June 7, 2009, Dr. Passi reviewed Plaintiff's X-rays and ordered an MRI of her cervical spine "due to radicular symptoms." (Tr. 327). On June 12, 2009, the MRI indicated "mild" foraminal stenosis "secondary to prominent osteophytes" and a "small" disc hernation "with mass effect and mild impingement on the spinal cord…resulting in foraminal stenosis and impingement on exiting right spinal nerve." (Tr. 328).

On June 25, 2009, Plaintiff followed-up with Dr. Passi. (Tr. 330). Plaintiff reported that her Oxycodone was no longer "working as much anymore," that she continued to have back and neck pain, and that she had last been able to work in February of 2009. (Tr. 330). Dr. Passi switched Plaintiff's pain medication to Darvocet and her oxycodone was discontinued. (Tr. 331).

On July 13, 2009, Plaintiff presented to Dr. Passi for a "disability evaluation." (Tr. 333). Plaintiff "report[ed] that she can sit no longer than 15 minutes without having to stand for at least five minutes…can lift 25-30 pounds…feels she cannot do any repetitive bending or stooping because of low back pain…cannot do any overhead work because her arms go 'numb.'" (Tr. 333).

Plaintiff's "occupational history includes completing high school and doing a two-year course for child care. She did not enjoy that occupation and did not stay with it…she then worked for 14 years as a construction worker until she could no longer do it because of back pain." (Tr. 333). On exam, Plaintiff had tenderness to palpation, full range of motion in her neck back, and extremities, and intact reflexes. (Tr. 333). Dr. Passi opined that:

> Given MRI findings and given chronicity of pain and my conversation with prior physician, I think it is reasonable to declare her disabled based on  level of training and nature of work with which she has experienced until we can get more intervention for her to see if we can improve her pain. I, therefore, declared her temporarily disabled on the form for up to one year until these measures are taken.

(Tr. 333-34). He specifically indicated that Plaintiff would be disabled for "less than twelve months," from July 13, 2009 to July 12, 2010, and did not indicate that she "may be a candidate for Social Security Disability or SSI benefits." (Tr. 336). On July 24, 2009, Plaintiff reported to Dr. Passi that her symptoms had neither increased nor decreased. (Tr. 338).

On July 25, 2009, an MRI of Plaintiff's lumbar spine indicated "[p]redominantly lower lumbar facet arthrosis changes…Mild bulging changes are noted without significant canal or foraminal encroachment." (Tr. 275).

On July 28, 2009, Dr. Shaik Ahmed, M.D., a pain management specialist, evaluated Plaintiff. (Tr. 282). Plaintiff was reporting constant pain that was increased by "sitting, walking, bending forward, driving, and lifting" and

"associated with numbness and tingling." (Tr. 283). Plaintiff's neurologic exam was normal, with intact strength and sensation. (Tr. 285-56). Plaintiff had tenderness and decreased range of motion in her spine. (Tr. 286). Dr. Ahmed performed bilateral cervical facet injections, instructed Plaintiff "remain active as tolerated," and continued her prescriptions. (Tr. 286).

On August 5, 2009, neurosurgeon Dr. Hani J. Tuffaha, M.D. evaluated Plaintiff. (Tr. 524-25).  Plaintiff reported neck, shoulder, and upper thoracic pain that had been present for "six months, progressively getting worse." (Tr. 524). On examination, she had "fairly good range of motion in all directions," with pain in her neck on right lateral rotation and numbness in the hands and fingers with maximal abduction above shoulder level. (Tr. 524). There was "no tenderness to percussion or palpation," "no demonstrable paravertebral muscle spasm," her "motor examination reveal[ed] no definite deficit," and her "sensory examination [was] intact." (Tr. 524). Dr. Tuffaha indicated that Plaintiff had "[i]ntractable cervical and bi-lateral shoulder pain with headaches, probably multifactorial," but "no surgically significant lesion on cervical MRI scan." (Tr. 525). He opined that there was "no indication for neurosurgical management." (Tr. 525). He also indicated that Plaintiff had  "[r]heumatoid arthritis, by history of likely contribution to her pain." (Tr. 524).

On October 19, 2009, Plaintiff transferred her primary care from Dr. Passi to Dr. James P. Herberg, M.D. (Tr. 392). Plaintiff reported chronic neck and back pain, and requested a flu shot and "to continue on her regular meds." (Tr. 392). On examination, Plaintiff had tenderness and decreased range of motion in her neck and back. (Tr. 392). She signed a pain management agreement and Dr. Herberg continued her Prilosec, Lorazepam, and Oxycodone. (Tr. 392).

On October 30, 2009, Plaintiff followed-up with Dr. Ahmed. (Tr. 408). She reported that the facet block injections on July 28, 2009 had provided her with "60% of pain relief lasting approx. 2.5 months." (Tr. 409).  He also noted that she was "very sensitive to pain, not a candidate for [radiofrequency ablation]." (Tr. 408). Plaintiff had tenderness and pain with range of motion in her spine. (Tr.410). Dr. Ahmed performed bilateral cervical facet injections, instructed Plaintiff "remain active as tolerated," and continued her prescriptions. (Tr. 410).

On January 28, 2010, Plaintiff followed-up with Dr. Herberg. (Tr. 383). Plaintiff's "physical examination [was] unremarkable except for some diminished breath sounds and tenderness over the cervical spine…with a decreased range of motion." (Tr. 383). Dr. Herberg prescribed her physical therapy. (Tr. 383).

On May 5, 2010, Plaintiff followed-up with Dr. Herberg.  (Tr. 370). She had tenderness,   decreased   range   of   motion,   and   "seem[ed]   to   have   some

decreased…sensation to pinprick in both upper extremities." (Tr. 370). Her medications were continued. (Tr. 370).

On May 14, 2010, Plaintiff followed-up with Dr. Ahmed. (Tr. 405). She reported that the last injection "help[ed] her neck pain for 2-3 months." (Tr. 405). He performed another injection and scheduled her to return in three months. (Tr. 405-06).

On September 13, 2010, X-rays of Plaintiff's thoracic spine indicated 'early degenerative change in the thoracic spine with mild anterior spur formation" and "no definite compression deformity or subluxation." (Tr. 404). X-rays of Plaintiff's cervical spine indicated "early degenerative changes of the cervical spine at C5-C6. No evidence of fracture or subluxation." (Tr. 403). Specifically, Plaintiff had only "small anterior and posterior osteophyte formation." (Tr. 403). An MRI of the cervical spine indicated "no significant interval change compared to the previous MRI of 6/12/2009." (Tr. 402).

On February 23, 2011, Plaintiff submitted a Function Report. (Tr. 164-172). She indicated multiple current physical and mental limitations, but did not indicate whether these limitations had been present prior to March 31, 2010. *Id.*

On April 11, 2011, state agency physician Dr. Louis Tedesco, M.D., reviewed Plaintiff's file. (Tr. 457-63). He completed an RFC assessment for Plaintiff's date last insured of March 31, 2010. (Tr. 457). He opined that, as of

March 31, 2010, Plaintiff could lift up to twenty pounds occasionally and up to ten pounds frequently. (Tr. 458). He opined that, as of March 31, 2010, Plaintiff could stand and/or walk for about six hours out of an eight-hour day and could sit for about six hours out of an eight-hour day. (Tr. 458). He opined that, as of March 31, 2010, Plaintiff was not limited in her ability to push or pull, did not have postural, manipulative, visual, communicative, or environmental limitations. (Tr. 459). Dr. Tedesco explained that her treatment for her back "has been essentially routine and conservative in nature," "she does not require an assistive device to ambulate," and her Function Report was "elegantly completed." (Tr. 462). Dr. Tedesco opined that Dr. Passi's opinion was not current, was not consistent with other evidence, and was on an issue reserved to the Commissioner. (Tr. 462).

On April 20, 2011, Plaintiff's application for disability benefits was denied at the initial level. (Tr. 89-93). On May 11, 2011, Dr. Tuffaha evaluated Plaintiff again, and noted that she "present[ed] with an exacerbation of neck, right shoulder and arm pain with associated numbness." (Tr. 526). She was "unable to raise the right arm above shoulder level." (Tr. 526). Dr. Tuffaha again opined that Plaintiff was not a candidate for neurosurgery. (Tr. 526).

On August 3, 2011 an MRI of the cervical spine indicated only "[s]light progression of disease compared to prior examination date 9/13/2010"  with no

other significant change and the "cervical spinal cord [was] normal throughout." (Tr. 530).

On September 27, 2011, Dr. Rodwan Rajjoub, M.D., a neurosurgeon, evaluated Plaintiff. (Tr. 465). Plaintiff reported that her pain had gotten "worse," that it was painful to touch the skin on her arms, that the numbness in her hands woke her up at night, and that she had numbness and tingling in her legs. (Tr. 465). Plaintiff had decreased strength in her upper extremities, decreased sensation, and a positive Spurling's test. (Tr. 469-70). Dr. Rajjoub recommended spinal surgery, which was performed on October 14, 2011. (Tr. 472). In December of 2011, Plaintiff reported that she was "doing well," with "no headaches like she had prior to surgery" and "no cervical pain," although she continued to have numbness. (Tr. 472).

On January 30, 2012, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 54). Plaintiff testified that she lived in a two-story house, and that she had been able to maintain a bedroom on the second floor until her surgery in October of 2011. (Tr. 60). She testified that she had started taking naps, but only in the past year. (Tr. 71). She admitted that her problems sleeping had only arisen in the past "couple of months." (Tr. 71). She testified that her difficulties walking long distances had arisen "[s]ince [her] surgery." (Tr. 73). She admitted that she would have been able to lift a gallon of milk prior to her October 2011 surgery, but

was no longer able to do so. (Tr. 75). She testified that her problems manipulating and grasping objects arose after her October 2011 surgery. (Tr. 75).

She testified that she had decreased her driving when things started going "downhill…a couple years" earlier. (Tr. 60-61). She testified that, prior to 2010, she got fired for "calling off on bad days" due to her neck and lower back. (Tr. 63). She testified that she had received unemployment "clear up until [she] filed for disability" in February of 2011. (Tr. 65). She testified that, up until February of 2011, she was "telling them that [she was] willing and able to work." (Tr. 66). She testified to various problems since her surgery in October of 2011. (Tr. 66-67). She testified that she had started being treated for depression not "too long ago." (Tr. 67). She testified that she only saw Dr. Tuffaha once before her date last insured, in August of 2009. (Tr. 68). She testified that she did not presently do any household chores and had stopped doing her hobbies before her date last insured. (Tr. 70). She testified that she began limiting her lifting and climbing stairs prior to her date last insured. (Tr. 73).

A VE also appeared and testified. (Tr. 79). The VE testified that, given the RFC assessed by the ALJ described below, Plaintiff not perform her past relevant work, but she could perform other work in the national economy. (Tr. 81). The VE also testified that if Plaintiff was limited to sedentary work, with a sit/stand option and the same nonexertional limitations described below, she could perform other

work in the national economy. (Tr. 82).  The VE testified that if Plaintiff could never bend, stoop, squat, or crouch, there would be no work she could perform. (Tr. 84). The VE testified that if Plaintiff would consistently have two or more absences per month, there would be no work she could perform. (Tr. 85).

On February 14, 2012, the ALJ issued the decision. (Tr. 10-26).  At step one, the ALJ found that Plaintiff was insured through March 31, 2010, and did not engage in substantial gainful activity in the period since 2008, although she had engaged in substantial gainful activity since her alleged onset of May 5, 2006. (Tr. 15). At step two, the ALJ found that Plaintiff's degenerative disc disease, herniated discs in the cervical spine, cervicalgia, lumbago, myalgia and myositis, rheumatoid arthritis, chronic pain syndrome, and chronic obstructive pulmonary disease were medically determinable and severe through the date last insured. (Tr. 15). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 16). The ALJ found that Plaintiff had the RFC to:

> [P]erform light work as defined in 20 CFR 404.1567(b) except she can occasionally stoop, crouch, crawl, and climb, but she cannot climb on ladders, ropes or scaffolds. The claimant can occasionally push and/or pull with her upper extremities. She can perform no overhead reaching. The claimant must avoid concentrated exposure to temperature extremes of cold and heat, wetness, humidity, vibrations, and hazards such as moving machinery and unprotected heights.

(Tr. 17).

The ALJ found that Plaintiff could not perform her past relevant work but, in accordance with the VE testimony, could perform other work in the national economy. (Tr. 21-22). As a result, the ALJ found that Plaintiff was not disabled prior to March 31, 2010 and not entitled to disability benefits. (Tr. 22).

## VI.      Plaintiff Allegations of Error

### A. The ALJ's Assignment of Weight to the Medical Opinions

Plaintiff must establish disability prior to the date last insured to qualify for DIB. As the Third Circuit has explained:

> [U]nder 42 U.S.C. § 423(a)(1)(A) and (c)(1), an individual is only eligible to receive disability insurance benefits if she was insured under the Act at the time of the onset of her disability. See also 20 C.F.R. §§ 404.130, 404.315(a); Kane v. Heckler, 776 F.2d 1130, 1131 n. 1 (3d Cir.1985). Here, the onset date of Appellant's disability is critical because it is determinative of whether she is entitled to benefits at all. See SSR 83–20, 1983 WL 31249, at *1 (1983). The ALJ determined, and the parties do not dispute, that based on Appellant's work history, the date when she was last insured was June 30, 1988. Therefore, to be entitled to disability benefits, Appellant was required to show that became disabled before this date.

*Perez v. Comm'r of Soc. Sec.,* 521 Fed.Appx. 51, 54 (3d Cir. 2013); *see also Winger v. Barnhart*, 320 F.Supp.2d 741, 743 (C.D. Ill. 2004) (Claimant who "worked only intermittently outside the home" and worked primarily as a "homemaker" was not entitled to DIB benefits, and this denial did not violate constitutional protections because "the quarters of coverage system: (1) makes the

Social Security program self-supporting, and (2) creates a method of limiting

Social Security benefits for those who have been dependent on their earnings.").

Medical evidence must support a finding of disability onset. Social Security

Ruling[2] ("SSR") 83-20 explains:

> In some cases, it may be possible, based on the medical evidence to
> reasonably infer that the onset of a disabling impairment(s) occurred
> some time prior to the date of the first recorded medical examination,
> e.g., the date the claimant stopped working. How long the disease may
> be determined to have existed at a disabling level of severity depends
> on an informed judgment of the facts in the particular case. This
> judgment, however, must have a legitimate medical basis. At the
> hearing, the administrative law judge (ALJ) should call on the
> services of a medical advisor when onset must be inferred. If there is
> information in the file indicating that additional medical evidence
> concerning onset is available, such evidence should be secured before
> inferences are made.

SSR 83-20.

Here, the ALJ complied with SSR 83-20 by relying on the opinion of Dr.

Tedesco. Dr. Tedesco opined that, as of the date last insured, Plaintiff could

perform a range of work in the national economy. (Tr. 457-63). *See Gibbs v.*

*Comm'r of Soc. Sec.*, 280 Fed.Appx. 194 (3d Cir. 2008) ("[T]he ALJ properly

followed SSR 83-20's requirements by calling a medical expert to help determine

the onset date of [claimant's] disability"); *Mendes v. Barnhart*, 105 Fed.Appx. 347,

---

[2] "Social Security Rulings…are binding on all components of the Social Security
Administration." 20 C.F.R. § 402.35(b)(1).

352 (3d Cir. 2004) (Testimony by a medical expert and medical records from treating physicians provided "evidence of the sort contemplated by S.S.R. 83–20").

However, Plaintiff asserts that the ALJ erred in assigning more weight to Dr. Tedesco than the treating physicians. First, Plaintiff asserts that "the opinions of these treating physicians are 'well supported by medically acceptable clinical and laboratory diagnostic techniques and ... not inconsistent with the other substantial evidence in [the] record' and should therefore be given controlling weight pursuant to 20 C.F.R. §404.1527." (Pl. Brief at 13). However, the treating opinions are inconsistent with Dr. Tedesco's opinion, so they are not entitled to controlling weight, even assuming they are well supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §404.1527.

Plaintiff alternatively changes the explanation provided by the ALJ, alleging that the ALJ "fails to explain why she would give weight to the opinion of Dr. Tedesco, who never treated, and never examined the Plaintiff… [the] ALJ does not address the work limitations endorsed by Physician's Assistant McGraw, except by saying she is not an acceptable medical source….[and] gives no explanation as to why she does not address Dr. Passi's disability opinion." (Pl. Brief at 13). However, the ALJ explained the weight given to each medical opinion:

> As for the opinion evidence, the undersigned considered the physician's assistant's opinion dated January 9, 2012 because a physician's assistant is not an acceptable medical source and it is dated almost two years after the date last insured (Exhibit 13F). In addition,

> it is more restrictive than the one offered by the surgeon and she gave the date how the restrictions last, but not when they started. The undersigned gives no weight to Dr. Rajjoub's opinion because it is offered nearly two years after her date last insured and there is no objective medical evidence that he treated her during the relevant period. The records showed progression after her date last insured (Exhibit 14F). The undersigned agrees with the State Agency opinion that the claimant has a nonsevere mental impairment based on the information in the record (Exhibit 9F). The undersigned gives some weight to the State Agency opinion regarding her physical residual functional capacity, but provides additional limitations since there is some decrease in range of motion and tenderness on examination (Exhibit 1IF).

(Tr. 21). The ALJ had earlier noted that "Dr. Passi thought it was reasonable to declare her disabled…[he] stated she was temporarily disabled for up to a year. (Exhibit 6F, pages 37-40)." (Tr. 18). The ALJ also adopted Dr. Tedesco's opinion, except for her limitations related to range of motion and tenderness, and Dr. Tedesco specifically noted that Dr. Passi's opinion was not current, was not consistent with other evidence, and was on an issue reserved to the Commissioner. (Tr. 21, 462). Because the ALJ emphasized that Dr. Passi only assessed temporary disability for up to a year, and the regulations require disability for a year or more, the Court can reasonably discern the ALJ's rationale for discounting this opinion. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir. 2013) (A Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). Thus, the ALJ provided adequate explanation for the Court to engage in meaningful review. *See Jones v.*

*Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.").

To the extent Plaintiff substantively challenges the assignment of weight to the medical opinions, the Third Circuit has repeatedly reiterated that an ALJ may assign greater weight to a state agency opinion than a treating opinion as long as evidence is not rejected for "no reason or the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993); *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356 (3d Cir. 2011). Section 404.1527(c) establishes the factors to be considered by the ALJ when assigning weight to medical opinions. 20 C.F.R. §§404.1527(c)(1) and (2) codify the general preference for treating opinions over non-treating opinions and examining opinions over non-examining opinions.  20 C.F.R. §404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship. 20 C.F.R. § 404.1527(c)(3) states that the "more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings" and the "better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that

opinion." 20 C.F.R. §404.1527(c)(5) provides more weight to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

Here, the ALJ properly applied the statutory factors and resolved the conflict in evidence created by the contradictory medical opinions. The ALJ did not reject any of the treating opinions for "no reason or the wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993). With regard to Dr. Passi, the ALJ correctly noted that Dr. Passi's opinion indicated only temporary disability, which would not support an award of benefits. *See* 42 U.S.C. § 423(d)(1) ("The term "disability" means--(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); *Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (Duration requirement means that a claimant must have an "inability" to work for twelve months). The ALJ also adopted Dr. Tedesco's opinion, who correctly noted that Dr. Passi's opinion was on an issue reserved to the Commissioner, and was thus not entitled to any weight. 20 C.F.R. §1527(d).

With regard to the physician's assistant opinion and Dr. Rajjoub's opinion, the ALJ correctly noted that both were authored two years after the date last insured and neither treated Plaintiff during the relevant period. (Tr. 21). This is a

factor which "tend[s] to…contradict the opinion[s]." 20 C.F.R. §404.1527(c)(6). This also demonstrates that they are not well-supported. 20 C.F.R. § 404.1527(c)(3).

The ALJ also explained that the record "showed progression after her date last insured." (Tr. 21). This is an accurate characterization of the record. Plaintiff's date last insured was March 31, 2010. (Tr. 21). The record shows that Plaintiff reported that facet block injections provided her with pain relief for "2.5 months" and "2-3 months" in October of 2009 and May of 2010, respectively. (Tr. 405, 409). Objective abnormalities remained the same, as demonstrated by the June 12, 2009 and September 13, 2010 cervical MRIs that indicated no change. (Tr. 402). However, a few weeks after Plaintiff's application for benefits was denied on April 20, 2011, she reported an "exacerbation" with new symptoms and objective findings in May and September of 2011. (Tr. 89-93, 526, 465-70). This was followed by spinal surgery in October of 2011. (Tr. 533).

A reasonable mind could accept this evidence as adequate to resolve the conflict in evidence favor of the state agency opinion that Plaintiff was not disabled as of March 31, 2010. *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Under the deferential substantial evidence standard of review, the Court may not reweigh evidence, and is bound by the reasonable conclusions of the ALJ. *See Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir.

1992) ("Neither the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder") (citing *Early v. Heckler,* 743 F.2d 1002, 1007 (3d Cir.1984)). Substantial evidence supports the ALJ's assignment of weight to Dr. Tedesco's opinion and onset date determination.

## B. The ALJ's Credibility Assessment

Plaintiff asserts that the ALJ erred in failing to credit her complaints of debilitating pain prior to her date last insured. (Pl. Brief at 9-11). Plaintiff notes that she reported subjective symptoms of pain to her providers (Pl. Brief at 9), received narcotic pain medication (Pl. Brief at 9-10), and had objective evidence of abnormalities that could be expected to cause her pain. (Pl. Brief at 10-11). However, none of these facts are dispositive regarding whether Plaintiff's claims regarding the intensity, persistence, and limiting effects of her pain were credible.

When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the

adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)). With regard to conservative treatment, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." SSR 96-7p.

Plaintiff asserts that the objective medical evidence and the opinions of her providers support her claims. However, Plaintiff's report of subjective pain to her providers does not transform these subjective reports into objective evidence:

> Even if it is assumed for the moment that Bitsko was an acceptable medical source, a medical source's recitation of subjective complaints is not entitled to any weight. *See* 20 C.F.R. § 404.1527(d)(2) (providing that a physician's opinion must be well-supported by objective medical findings in order to be entitled to weight); *see also Craig v. Chater,* 76 F.3d 585, 590 n. 2 (4th Cir.1996) (holding that a medical source does not transform the claimant's subjective complaints into objective findings simply by recording them in his narrative report). Therefore, the ALJ was not required to adopt the subjective limitations that Bitsko repeated, but did not observe….

*Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 879 (3d Cir. 2005).

Additionally, Dr. Tedesco reviewed the medical evidence, and found that Plaintiff

could still perform a range of work. (Tr. 457-63). Although Plaintiff requests that the Court reweigh this medical evidence, as discussed above, the ALJ was entitled to rely on Dr. Tedesco's interpretation of the objective evidence.

Plaintiff does not challenge the ALJ's conclusion that her conservative treatment through her date last insured rendered her statements regarding pain less credible. (Tr. 18-21). Dr. Tedesco also concluded that Plaintiff was only partially credible because her treatment had been routine and conservative. (Tr. 457-63). This is a proper basis to reject Plaintiff's credibility. SSR 96-7p ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints").

Plaintiff also does not challenge the ALJ's conclusion that she testified to a decline in function after her surgery in October of 2011, which contradicts her claim that she suffered work-preclusive pain prior to March 31, 2010. (Tr. 18-21). This is an accurate characterization of the record. On January 30, 2012, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 54). Plaintiff testified that she lived in a two-story house, and that she had been able to maintain a bedroom on the second floor until her surgery in October of 2011. (Tr. 60). She testified that she had started taking naps, but only in the past year. (Tr. 71). She admitted that her problems sleeping had only arisen in the past "couple of months." (Tr. 71). She testified that her difficulties walking long distances had arisen "[s]ince [her]

surgery." (Tr. 73). She admitted that she would have been able to lift a gallon of milk prior to her October 2011 surgery, but was no longer able to do so. (Tr. 75). She testified that her problems manipulating and grasping objects arose after her October 2011 surgery. (Tr. 75). These claims are inconsistent with an onset date prior to March 31, 2010, and the ALJ properly discounted Plaintiff's credibility on this ground. SSR 96-7p.

A reasonable mind could accept this evidence as adequate to conclude that Plaintiff's subjective complaints were not fully credible with regard to her impairments prior to March 31, 2010, and substantial evidence supports the ALJ's credibility assessment. *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

Moreover, Plaintiff does not allege any specific functional limitations arising from her pain that would have precluded her from working. Plaintiff's pain is only relevant to the extent it causes work-related functional limitations. Plaintiff's failure to identify any limitations waives this argument. *See Kiewit Eastern Co., Inc. v. L & R Construction Co., Inc.,* 44 F.3d 1194, 1203–04 (3d Cir.1995) (upholding a district court's finding that a party had waived an issue when a party only made vague references to the issue); *Crawford v. Washington*, 541 U.S. 36, 68 (2004) (declining to "mine the record" in order to support party's case). Similarly, in the absence of additional work-related functional limitations, any

error by the ALJ would be harmless. *See Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005) (remand is not required when it would not affect the outcome of the case).

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.     This appeal be DENIED, as the ALJ's decision is supported by substantial

evidence; and

II.      The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: March 12, 2015          _____s/Gerald B. Cohn_____
                                        GERALD B. COHN
                               UNITED STATES MAGISTRATE JUDGE